868 F.2d 36
 130 L.R.R.M. (BNA) 2593, 110 Lab.Cas. P 10,940
 Joe L. BARR, a/k/a Joseph L. Barr, Plaintiff-Appellee (re: 88-7230),
v.
UNITED PARCEL SERVICE, INC. and Local 804 of the
International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, Defendants,
Local 804 of the International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America,
Defendant-Appellant (re: 88-7230),
United Parcel Service, Inc., Defendant-Appellee (re: 88-7230),
Joe L. BARR, a/k/a Joseph L. Barr, Plaintiff-Appellee (re: 88-7244),
v.
UNITED PARCEL SERVICE, INC., and Local 804 of the
International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, Defendants,
United Parcel Service, Inc., Defendant-Appellant (re: 88-7244)
 Nos. 23, 24, Dockets 88-7230, 88-7244.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 13, 1988.
Decided Feb. 10, 1989.
 
 Richard N. Gilberg, New York City (Cohen, Weiss and Simon, New York City, Susan Davis, Earl R. Pfeffer, of counsel), for Local 804 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.
 Harold J. Johnson, Brooklyn, N.Y. (Flamhaft Levy Kamins Hirsch & Booth, Brooklyn, N.Y., of counsel), for Joe L. Barr.
 Jeffrey A. Mishkin, New York City (Proskauer Rose Goetz & Mendelsohn, Mary Ruth Houston, New York City, of counsel), United Parcel Service, Inc.
 Before LUMBARD and MAHONEY, Circuit Judges, and CHOLAKIS, District Judge.*
 LUMBARD, Circuit Judge:
 
 
 1
 This is an appeal from a judgment entered on a jury verdict in the Eastern District of New York, Charles P. Sifton, Judge, ordering Joseph L. Barr's reinstatement and awarding him back pay in his suit against his former employer, United Parcel Service, Inc. (UPS), for wrongful discharge, and his labor union, Local 804 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 804), for having violated its duty of fair representation under LMRA Sec. 301. The district court apportioned the stipulated back pay damages by holding UPS liable in the amount of $2,482.48 and Local 804 liable for the balance of $83,349.82. The principal contention of UPS and Local 804 is that there was insufficient evidence of a breach of Local 804's duty of fair representation for that claim to go to the jury. We agree, and accordingly we vacate the verdict and dismiss Barr's complaint.
 
 I.
 A. The March Incident
 
 2
 The events which culminated in this appeal took place at UPS's package sorting facility in Maspeth, Queens, New York, at about 3:50 a.m. on March 1, 1983. Barr, a package sorter who had worked for UPS for fourteen years, allegedly failed to produce a package in his possession for a security inspection when he was leaving the plant after his 5:45 p.m. to 2:45 a.m. shift. UPS maintains security checkpoints at the exits of its Maspeth plant to prevent thefts by its employees of parcels in its care; a UPS rule, published and in effect for several years and which had been reaffirmed by a posted notice on February 11, 1983, provided that "[e]mployees exiting the building with any bags, attache cases, etc., must open them for inspection by the guard on duty." The rule explicitly stated that an employee's failure to comply with this procedure might result in his or her discharge.
 
 
 3
 The evidence we summarize was formally presented first at the arbitration hearing at which Barr's discharge was upheld and again, de novo, at trial. Although the parties have quite different versions of the events at the security checkpoint on March 1, the evidence adduced at trial is generally consistent with that presented at the arbitration hearing.
 
 
 4
 Barr's version is that when he passed the checkpoint, he displayed to Siro Security Guard Antonio Mateo the contents of the 11 1/2 by 14 inch flat brown paper bag which he was carrying. (UPS retained Siro Security to provide security services at the Maspeth facility.) Barr testified, both at the arbitration hearing and at trial, that he had taken the then-empty paper bag from his locker in the plant and had placed several dental insurance forms inside. He then met two co-workers, Harold Griffin and Johnny Scott, whom he had agreed to drive home. As the three men passed Mateo, Mateo asked Barr to show him the contents of the bag. Barr alleges that he removed the dental forms from the bag, inverted it and shook it to show that it was empty, replaced the forms inside the bag and walked past Mateo and out of the plant. He heard Loss Prevention Clerk James R. Albert (whose name Barr did not know at the time) say "Hey buddy" in Barr's direction when Barr was about six car lengths from the UPS main gate. He then turned around, and Albert accused him of having failed to show his bag to Mateo. Barr replied that he had shown Mateo the bag, and he alleges that he showed it to Albert as well, by removing the forms and shaking the bag in the same manner as before. He then got in his car and departed; Albert wrote down the license plate number of the car and reported the incident. Barr further alleges that an unidentified supervisor drove alongside his car while he was waiting for it to "warm up" and asked what had happened. Barr told this supervisor that a guard had asked him about his bag and that he had shown the guard its contents. The supervisor then drove away.
 
 
 5
 Mateo's recollection was quite different. He testified that, when he asked Barr (whom he alleges he did not know) to permit him to examine the bag, Barr responded "no" and kept walking through the gate with one companion, whom Mateo also did not know. Mateo went immediately to the nearby Loss Prevention office and told Albert what had happened. Mateo and Albert went outside, where Albert then confronted Barr. Mateo and Albert then went back inside the plant, where Mateo signed a statement to the effect that he had seen an employee exit the plant, had asked to see his bag, had been refused and had reported the incident to Albert.
 
 
 6
 Albert, who had worked part time for over five years in the UPS loss prevention office, alleged that Mateo reported the incident at the gate to him at 3:50 a.m. on March 1 and that the two of them then went outdoors, where Mateo pointed out Barr and one other employee. Albert asserts that, when he identified himself to Barr, Barr asked him if he wanted to look into the bag and partly removed some papers from the bag. Albert declined to inspect the bag (it apparently being "too late", since the men were outdoors and the rule requires that bags be inspected inside the plant). Albert says that he then returned to the plant, spoke with Mateo and prepared statements for himself and Mateo to sign.
 
 
 7
 Barr called Griffin and Scott, the two men whom he drove home after their shift on March 1, as witnesses at both the arbitration and the trial to corroborate his version of the incident that had occurred at the security checkpoint. Both Griffin and Scott testified that Barr had displayed the contents of his bag to Mateo as the three men passed the checkpoint. Griffin's and Scott's recollections of the scene were essentially identical to Barr's, except that Griffin did not hear the exchange at the checkpoint between Barr and Mateo. Although Barr, Griffin and Scott allege that all three of them passed the checkpoint together, Mateo and Albert claim to have seen only one other man with Barr.
 
 B. The Grievance Procedure
 
 8
 This case concerns the events that took place after the March 1 incident. Barr alleges, and the jury found, that Local 804 violated its duty fairly to represent Barr in the various steps in the dispute resolution process that was set in motion by the incident at the gate. In order to assess these claims, we relate, in some detail, the actions Local 804 took on Barr's behalf.
 
 
 9
 Barr's complaints about the union's alleged violation of its duty must be analyzed in the context of the provisions of the collective bargaining agreement between UPS and Local 804. Article 20 of that agreement, in effect at all relevant times between UPS and Local 804, governs the resolution of disputes and provides a step-by-step process for grievances, with binding and final arbitration the last step. When UPS and an employee have a dispute, the complaining party first brings the grievance to the attention of the shop steward (an employee who is also a union officer) on the employee's shift, in what is termed a "Step 1" meeting. In cases which involve employee discipline, the matter first comes to the union's attention when the supervisor in charge notifies the shop steward of the rule violation. If the shop steward, the employee and the supervisor are unable to resolve the problem within one day after the Step 1 meeting, a Step 2 meeting is held. At this step, an officer of the union refers the matter to a division manager or other executive officer of the company, who is to render a decision within five days of the referral. If the grievance is not resolved at the Step 2 stage, the parties submit the matter to binding arbitration.
 
 
 10
 On the morning of March 1, 1983, immediately after the events at the security gate, UPS Company Manager Steve Ruggerio informed Al Henley, a shop steward on the 9 p.m. to 7 a.m. shift, what had happened at the gate and told him that UPS had a disciplinary claim against Barr. Since Barr had left the plant immediately after the incident, Henley was unable to locate him before he left the plant at 7 a.m., and therefore he telephoned John Brown, a shop steward on the 12:45 p.m. to 9:45 p.m. shift, when he got home. Henley told Brown what little he knew about the incident, and Brown agreed to investigate the complaint and speak to Barr that day.
 
 
 11
 The parties agree that both Henley and Brown knew how serious the charge against Barr was and that it could result in his discharge; besides having been shop stewards for 15 years, they both knew of a similar case that occurred several months previously, in which one Jeffrey Jones, who had allegedly refused to show his bag to the guards upon exiting the plant, was discharged. Henley had represented Jones in that matter, in which the arbitrator upheld the discharge.
 
 
 12
 When Brown got to the plant that midday, he initiated an investigation by speaking to several employees on Barr's shift to see if they had heard anything about the Barr incident. None had, according to Local 804, but one employee did suggest that Brown talk to Griffin (one of Barr's witnesses). Brown did so, and also talked to Barr when Barr arrived for his shift that evening. Testimony at trial elicited the fact that Barr reacted with surprise and professed lack of knowledge when he was first told that UPS might have a charge against him; both Barr and Griffin apparently claimed at first to have no idea to what Brown was referring. When Henley arrived for his shift, Brown spoke to him about developments in the case. Henley then met with Barr, who again denied having had any trouble with the security guard.
 
 1. The Step 1 Meeting
 
 13
 Later that night (the night of March 1 and 2, 1983), UPS Division Manager Jim McGinn told Henley that UPS planned to call a Step 1 meeting about the incident. Henley testified that he then spoke again with Barr, saying "you better let me know" what had happened. Barr at this time first related his story to Henley: He had shown the bag contents to Mateo, the contents were the dental benefit claim forms, Griffin and Scott had witnessed Barr showing Mateo the bag and contents, and Barr had shown the bag again to Albert and had spoken to a supervisor afterwards. Henley then spoke immediately with Griffin and Scott, both of whom denied having seen anything.
 
 
 14
 Because Mateo was not at work that night, the Step 1 meeting was put off until the next night; Barr worked his shift ending at 2:45 a.m. on March 2 without further discussion of the charge.
 
 
 15
 On March 2, Local 804 Business Agent Bill Pritchard, who was at UPS's Maspeth facility that afternoon, spoke with Brown and Henley about Barr's case. Henley told Pritchard about the cancellation of the Step 1 meeting the night before, and Pritchard advised Henley to request a 72-hour notice on Barr's behalf at the meeting, which had been rescheduled for the night of March 2 and 3. (A 72-hour notice, as defined in the collective bargaining agreement, delays any disciplinary action taken by UPS for three days after the Step 1 meeting so that Local 804 can investigate further. The delay may be demanded in any case except those involving admitted or proven dishonesty or drinking.) Pritchard also advised Henley that it would not be a good idea to take Griffin and Scott to the Step 1 meeting, because, the union claims, it is not union practice to present witnesses at grievance meetings short of arbitration and because, in Pritchard's opinion, Barr himself, a longstanding employee with a clean record, would be more persuasive than his witnesses, both of whom had had disciplinary problems at UPS in the past.
 
 
 16
 Later that night, UPS Division Manager David Donnelly, who had taken over the Barr matter from McGinn, called a Step 1 meeting for midnight on March 2. Present at the meeting were Barr, Henley, Donnelly, Mateo, Albert and Loss Prevention Manager James Tobin. Donnelly informed Barr of the charge against him. Mateo, Barr and Albert then described their versions of the events; Barr and Henley both physically demonstrated Barr's version of what had happened. Henley and Barr disagree about whether a prior incident between Mateo and Barr (summarized infra) was discussed. Henley testified that he did not know then about that incident, but Barr alleges and Donnelly testified that it was mentioned briefly; Donnelly testified that it was not a factor in his decision.
 
 
 17
 Donnelly discharged Barr at the Step 1 meeting, citing "breach of security" as the reason. He refused Henley's request for a 72-hour notice of discipline and also took the position that Henley's production of Barr's witnesses would not change his opinion.
 
 
 18
 Barr alleges several breaches of Local 804's duty at the Step 1 meeting. He asserts that his witnesses should have been called at the Step 1 meeting. He also claims that the union did not, during the 45 hour period between UPS's notice that charges would be brought against Barr and the Step 1 meeting, act swiftly enough or with sufficient vigor to prepare for the meeting. It was not enough, Barr argues, for Local 804 merely to have conducted several interviews prior to the meeting.
 
 
 19
 Barr does not dispute that Henley represented him fairly at the Step 1 meeting. Rather, he asserts that Pritchard should have represented him from the start. He argues that it was his "understanding" that Pritchard would be present at the Step 1 stage; Local 804 responds that it is the written policy of the union to have shop stewards represent employees at the first stage of the grievance process.
 
 2. The Step 2 Meeting
 
 20
 Immediately after the Step 1 meeting and Barr's discharge, at 1:15 a.m. on March 3, Henley telephoned Pritchard at home. Pritchard, in accordance with Local 804's practice, took over the case, and elected to proceed to Step 2; he arranged for a Step 2 meeting to be held on March 7 with UPS District Manager Thomas Petley.
 
 
 21
 At the Step 2 meeting, attended by Petley, Donnelly, Pritchard, Henley and Barr, Barr again demonstrated what he claimed had happened on March 1. Pritchard then spoke on Barr's behalf, mentioned Barr's witnesses and attempted to distinguish Barr's case from the Jones matter, in which the discharged employee admitted having left the plant without having opened his bag. Barr's witnesses were not present at the meeting, nor were Mateo or Albert. However, Pritchard testified that he spoke to Petley alone after the meeting, again raising the differences between Barr's case and the Jones matter and again offering to present Barr's witnesses, but that Petley was uninterested in Pritchard's further arguments and implied that Donnelly's decision to discharge Barr would be sustained. On March 9, Petley upheld the discharge.
 
 
 22
 Barr's complaints about Local 804's conduct before and during the Step 2 meeting are similar to those he voices concerning Step 1. He maintains that Local 804's continuing failure to call Scott and Griffin at the informal meeting stage of the grievance procedure, or at least to request that Petley interview them, manifested a breach of its duty. As additional errors on Local 804's part, Barr points to the union's failure to require that Mateo attend the Step 2 meeting and that Pritchard, having failed to meet with Barr prior to the session, was ill-prepared and argued unforcefully, presenting only nondescript evidence with the thrust that Barr was "a good employee" and had "never had a problem with anybody."
 
 3. The Arbitration Hearing
 
 23
 The dispute went to arbitration on March 14, 1983 before Arbitrator Arthur Stark of the American Arbitration Association, as provided by the collective bargaining agreement. Prior to the hearing, Pritchard reviewed the case with Local 804's attorney, Stanley Berman, and also convinced Griffin to testify as a witness. On the day of the hearing, Pritchard and Berman met for about a half hour with Barr, Scott, Griffin, Henley and Shop Steward John Callan.
 
 
 24
 At the arbitration hearing, Barr testified that he had shown the contents of his bag to Mateo and demonstrated his testimony, Griffin and Scott corroborated Barr's story, and Pritchard testified on Barr's behalf. Counsel for UPS called Mateo and Albert.
 
 
 25
 By opinion dated April 7, 1983, Arbitrator Stark upheld Barr's discharge. In his opinion, Arbitrator Stark summarized the testimony of Barr, Mateo, Albert, Scott, and Griffin. (Their testimony at the hearing was substantially identical to their testimony at trial.) Arbitrator Stark then compared Barr's case to the arbitration in the Jeffrey Jones case. The Jones incident, which similarly involved a breach of the package inspection rule, also involved security guard Mateo. The arbitrator in the Jones case had found Mateo to be a credible witness. Using that precedent, Arbitrator Stark likewise credited Mateo's testimony over Barr's, finding that Mateo had no history of making frivolous charges, that he had no "ulterior motive" and that he had clearly seen Barr pass his station and would have seen Barr invert and shake the bag had Barr done so.
 
 
 26
 Barr claimed, and Local 804 argued at the hearing, that the Jones case was distinguishable because Jones admittedly had failed to show the contents of his bag to Mateo, whereas Barr maintained vehemently that he had complied with the rule. Arbitrator Stark nevertheless found the Jones matter to be controlling and ruled that discharge was the appropriate remedy once the veracity of the security guard's testimony had been ascertained.
 
 
 27
 Finally, in response to Local 804's argument that a penalty short of discharge was called for given the residual doubt that Barr had indeed violated the rule, Arbitrator Stark wrote that, had such doubt existed in his mind, he would have ordered that Barr be reinstated. A "deliberate flouting" of a rule so important to UPS's security, he wrote, demands a penalty no less severe than termination.
 
 
 28
 Barr alleges that three serious omissions on the part of Local 804 seriously prejudiced his case before the arbitrator. First, he alleges that Local 804 did not adequately prepare for the arbitration hearing. He maintains that brief meetings with Berman, union personnel, the witnesses and Barr himself were insufficient preparation for a hearing involving Barr's livelihood. Had Berman been better prepared, Barr claims, he would have found that to make a fair effort on Barr's behalf would have required him to present evidence concerning an alleged UPS policy to replace senior full-time employees with less expensive part time workers and at least some testimony from Henley, the union official closest to Barr and the incident.
 
 
 29
 Second, Barr claims that Local 804 should have offered evidence at the arbitration concerning a prior incident between Barr and Mateo, which evidence Barr maintains would have proven that Mateo had an "ulterior motive" and hostile intent. On February 17, 1983, several weeks prior to the incident giving rise to his discharge, Barr claims, he had promised UPS Company Supervisor James Gummer a ride home after the shift ending at 3:45 a.m., and they had planned to meet at the end of the shift at the same gate that Barr exited through on March 1. When Gummer did not appear at the appointed time, Barr asked Mateo whether he could use the telephone at the security desk to call Gummer; Barr alleges that Mateo's response was, "You're not going to use the m--- f--- phone", and that, to Barr's suggestion that he would ask to use the telephone in the security office, Mateo answered, "You're not going to use that m--- f--- phone either." The dispute over whether this incident ever occurred was not resolved; Mateo has claimed throughout the proceedings that he did not recognize Barr on March 1. Barr alleges, however, that had Local 804 presented evidence of this prior incident at the arbitration hearing (which evidence would likely have been limited to Barr's testimony), Arbitrator Stark would have found that a reason existed to discredit Mateo's testimony and quite possibly would have found for Barr. Local 804's failure to present such strong exculpatory evidence, in Barr's view, constituted a breach of its duty of fair representation.
 
 
 30
 Third, Barr alleges that Local 804 failed to raise the issue of whether UPS was intentionally "setting up" full-time employees with seniority so that it could discharge them and replace them with less costly part-time workers. Barr now alleges complicity by Local 804 in this endeavor.
 
 C. Barr's District Court Complaint
 
 31
 Barr filed suit in the Eastern District on October 5, 1983, alleging that the numerous improprieties in Local 804's representation of him had led to the erroneous upholding of his discharge at arbitration. His complaint alleged (1) that UPS had wrongfully discharged him pursuant to its unlawful policy of discharging senior workers in order to replace them with part-time, less expensive employees; (2) that Local 804 made certain decisions regarding Barr's case in bad faith; (3) that Local 804 and UPS were in collusion with respect to the employee replacement objective referred to above; and (4) that Local 804 thereby violated its statutory duty of fair representation under Sec. 301 of the Labor Management Relations Act (29 U.S.C. Sec. 185). He demanded reinstatement and damages of one million dollars, apportioned between UPS and Local 804 in proportion to their respective shares of the liability.
 
 
 32
 The case went to trial on April 14, 1987, before a jury, which returned a verdict for Barr on April 22, 1987. Based on the parties' stipulation that Barr's damages in terms of lost wages amounted to $85,832.30, Judge Sifton, on May 19, 1987, held UPS primarily liable for $2,482.48 and Local 804 primarily liable for the remaining $83,349.82, with prejudgment interest to be paid in the same ratio. This apportionment accords UPS liability for Barr's pay for the period from his discharge until that point at which Local 804's breach of its duty of fair representation shifted the liability to it. The court also awarded attorneys' fees against Local 804 only. The final judgment also ordered that UPS reinstate Barr with full pay and no loss of seniority.
 
 
 33
 Both Local 804 and UPS moved for judgment notwithstanding the verdict in December 1987, which Judge Sifton denied on February 9, 1988.
 
 
 34
 On appeal, Local 804 and UPS argue that Local 804 did not violate its duty of fair representation and, therefore, that the arbitrator's ruling may not be disturbed. They additionally argue that Judge Sifton erred when he submitted the fair representation claim to the jury and that he incorrectly charged the jury on that issue. Finally, Local 804 contends that the apportionment of damages is improper.
 
 II.
 
 35
 Because we find that insufficient evidence exists to support Barr's claim that Local 804 breached its duty of fair representation, we agree with Local 804 and UPS that Arbitrator Stark's award may not be disturbed. Accordingly, we vacate the judgment of the district court and dismiss Barr's complaint.
 
 
 36
 Barr alleges that Local 804 violated its duty of fair representation by its specific actions and inactions during the grievance procedure. He alleges that Local 804's decisions in its representation of him amounted to bad faith and perfunctory processing of the challenge to his discharge. While each of the specifically alleged breaches may, with the benefit of hindsight, be viewed as a possible tactical error by Local 804, none of them, taken either singly or collectively, are nearly sufficient to make out a prima facie case that Local 804 breached its duty fairly to represent Barr. As for the alleged conspiracy between UPS and Local 804, we find no evidence whatever to support Barr's allegations.
 
 
 37
 In order to have prevailed against the union, Barr would had to show either that the conspiracy existed or that these tactical decisions, none of which were circumscribed by either the collective bargaining agreement or Local 804's own rules and procedures, amounted to conduct and omissions "so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." N.L.R.B. v. Local 282, International Brotherhood of Teamsters, 740 F.2d 141, 147 (2d Cir.1984) (quoting Robesky v. Qantas Empire Airways, Ltd., 573 F.2d 1082, 1089-90 (9th Cir.1978)). Absent such a showing, the award of an arbitrator whose decision the parties have contractually agreed will be final may not be disturbed. See DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 163-65, 103 S.Ct. 2281, 2289-91, 76 L.Ed.2d 476 (1983).
 
 
 38
 Two elements must be proven for a breach of the duty of fair representation claim: The union's conduct must, first, have been "arbitrary, discriminatory or in bad faith," Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967), and second, it must have "seriously undermine[d] the arbitral process." Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976). The evidence presented was not sufficient to support a verdict that the union failed to fulfil its duty of fair representation in keeping with these standards.
 
 
 39
 Barr contends that Local 804 was acting in complicity to UPS in UPS's efforts to reduce the proportion of full-time employees with seniority in its workforce. Accordingly, Barr alleges, Local 804 only perfunctorily went through the motions of contesting his discharge through arbitration. In our review of the evidence adduced at the arbitration and at trial, we find not a scintilla of evidence to support this assertion.
 
 
 40
 Barr argues that Local 804 acted arbitrarily and in bad faith when it refused to present Barr's witnesses at the Step 1 or Step 2 meetings and by failing both to prepare adequately for the meetings and the arbitration hearing and to have Pritchard represent Barr from the outset. While these decisions might conceivably have affected the outcome of the arbitration, they indubitably do not rise to the level of bad faith and arbitrariness. In hindsight, any decision a union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous. The decisions taken here by Local 804 were tactical in nature. At most, they may have been errors of judgment. In any event, they were not so egregious as to be evidence of bad faith and failure fairly to represent Barr.
 
 
 41
 Tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach. "[P]roof of mere negligence or errors of judgment ... is insufficient.... 'As long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage.' " Cook v. Pan American World Airways, Inc., 771 F.2d 635, 645 (2d Cir.1985), cert. denied, 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986) (quoting Capobianco v. Brink's Inc., 543 F.Supp. 971, 975 (E.D.N.Y.1982), aff'd mem., 722 F.2d 72.7 (2d Cir.1983)). None of the evidence adduced at trial concerning Barr's allegations of specific failings of Local 804 detracts from our conclusion that any errors Local 804 might have made were of a tactical nature.
 
 
 42
 Local 804's practice is not to present witnesses at the earliest stages of a grievance. Although the reason for this policy is unclear--some testimony indicated that the practice was adhered to for the tactical purpose of avoiding appearing too adversarial in the early stages, while other witnesses at trial testified that the union could not be sure at that early stage whether the witnesses had in fact seen the incident--Barr proffered no evidence (other than the fact that his discharge was eventually sustained) to indicate that Local 804's decision not to present Griffin and Scott until the arbitration hearing was motivated by anything other than strategy. In fact, Barr did not complain to Henley or to Pritchard about their handling of the Step 1 and Step 2 meetings; the UPS officials at both of those meetings indicated to Henley and Pritchard that the witnesses' testimony would not have swayed them. Moreover, the union's decision had some support in its previous experiences in such matters and the records of the two witnesses. Barr was a senior employee with a good work record; both Scott and Griffin had blemishes on their records. There was no evidence of bad faith in Local 804's decision to save the witnesses' appearances for the arbitration hearing.
 
 
 43
 Similarly, we find no evidence to support the assertion that Pritchard should have become involved earlier. Local 804's written practice was to have shop stewards represent employees at Step 1 meetings. Despite Barr's "understanding" that business agents commonly represented employees at Step 1 meetings, nothing at trial supported the proposition that Local 804 failed competently and fairly to represent him at each stage of the grievance procedure.
 
 
 44
 As for the decisions concerning the witnesses to be presented at the arbitration hearing, we likewise can find no evidence that Local 804's conduct approached that which was faulted in Vaca and Hines. Barr offers no rationale for his assertion that Henley's failure to testify at the arbitration amounted to bad faith. With respect to the telephone incident between Barr and Mateo on February 17, 1983, there is little reason to believe that Local 804 would have found it helpful to raise the incident at trial. It was reasonable for Berman to have decided that evidence about that incident would not advance Barr's cause.
 
 
 45
 Finally, we disagree with Barr's assertion that Local 804 violated its duty of fair representation when it failed to conduct a polygraph examination to exonerate Barr. The evidentiary value of such evidence is doubtful, at best. A union's good faith, non-arbitrary failure to take an action that is unlikely to be advantageous does not subject it to liability for breach of its duty of fair representation. Vaca, supra.
 
 
 46
 In view of our conclusion that there was insufficient evidence to support a verdict that Local 804 breached its duty of fair representation, we need not consider the other claims of error raised by UPS and Local 804.
 
 
 47
 Judgment vacated; complaint dismissed.
 
 
 
 *
 The Hon. Con. G. Cholakis, United States District Judge for the Northern District of New York, sitting by designation