Olga LAPIR, Plaintiff,

v.

MAIMONIDES MEDICAL CENTER et alia, Defendants.

No. CV–88–0749.

United States District Court, E.D. New York.

Oct. 8, 1990.

**1172**

Eugene Prosnitz, New York City, for plaintiff.

Patterson Belknap Webb & Tyler, New York City, for defendant Maimonides.

Eisen & Levy, P.C., New York City, for Local 1199.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This is an action filed by plaintiff, Olga Lapir, against her former employer, defendant Maimonides Medical Center ("MMC"), and her union, defendant Local 1199, Drug, Hospital and Health Care Employees Union, RWDSU, AFL–CIO, pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). Plaintiff's "hybrid" section 301 complaint alleges that the MMC breached the collective bargaining agreement between the hospital and the union by terminating plaintiff's employment without good cause and that the union's failure to process plaintiff's grievance through arbitration constitutes a breach of its duty of fair representation. This matter is now before the Court on defendants' motions for summary judgment. For the following reasons, these motions are granted.

The following background information is essentially undisputed except as noted. Plaintiff was employed by MMC as a blood bank technician from April 1984 until July 1987, when her employment was terminated as a result of an incident that occurred on July 10, 1987. On that day, Lapir was working an 11 a.m. to 7 p.m. shift in the main blood bank, where her job was to cross-match blood samples of patients with donated blood. At some point between 5 and 7 p.m., a Dr. Stanley Sprecher came to the blood bank requesting that special blood be set aside for his father, who was a patient at MMC and who had undergone surgery. Sprecher, who was not his father's doctor, identified himself as a member of a blood donor club, Bikur Cholim, who wished to locate some blood from this group for his father. Sprecher was told by the blood bank desk clerk or receptionist that she was unable to grant this request. At Sprecher's insistence, the clerk referred the matter to the lead technician on duty, a Mr. Bernard, who also advised Sprecher that his request could not be granted.

At this time, Lapir was in the process of performing a cross-matching but had a 10

or 15 minute pause in performing her duties. Lapir, who was at the back of the room in which Sprecher appeared, went up to the front desk and asked if she could help. Sprecher repeated his request and told her that it was his belief that blood donated to the Bikur Cholim account could be used by his father. Lapir states that she had never met Dr. Sprecher or heard of Bikur Cholim before that night.

Although by her own admission, plaintiff at this point concluded that, granting Dr. Sprecher's request would violate hospital rules concerning the anonymity of donated blood and the confidentiality of blood donors, Lapir nevertheless sent Sprecher to the blood donor room, where lists of donors are kept. At the donor room, Sprecher told the clerk on duty, Ms. Lombardi, that a blood bank technician needed the Bikur Cholim donor list. Lombardi, after some deliberation with the nurse on duty, went to the blood bank to determine which technician needed this list. Lapir identified herself as the technician and took the list from the clerk. Lapir now claims that she concluded from the fact that the blood bank had produced the list that complying with Sprecher's request would not violate hospital rules.

Although in possession of the list, Lapir did not know how to access the computer to find an available unit of Bikur Cholim blood. According to Lapir's deposition, she and Sprecher went to the computer room and asked the technician, Brenda Jackman, for assistance. Jackman explained how to get a unit according to the desired blood type. Lapir then used the list and her own code to access the blood bank computer to get additional information about Bikur Cholim donors who had donated recently.

Lapir then went to the blood bank refrigerator to find the units from Bikur Cholim donors identified by the computer. Lapir located one available unit, took the unit from the shelf, and reserved it for the patient by placing a card on the unit and placing it on another shelf next to three units that had been specifically directed for the patient's use in the case of emergency. Sprecher was present while Lapir located the unit of blood.

According to Lapir, her assistant supervisor, Mr. Matellus, was present in the blood bank during this entire series of events and never told her to stop. At the same time, plaintiff acknowledged that she never spoke to him or asked for guidance or direction. Plaintiff's own papers give contradictory accounts as to the duration of the entire incident.[1]

Plaintiff was fired shortly thereafter as a result of this incident. In an employee warning notice dated July 23, 1987, the MMC characterized Lapir's decision to allow Sprecher to accompany her to the computer room, to the computer, and to the blood bank refrigerator as:

"[a] direct violation of all Blood Bank procedures as communicated to you and all other Blood Bank personnel at departmental meetings. Your action jeopardized the confidentiality of our Blood Bank procedures and therefore jeopardized our entire Blood Bank program."

The MMC's policies mandate that all blood donations be handled in a confidential manner. Thus, when blood is collected from donors, the donors are assigned a numerical code. This code and the blood type and pH factor are the only identifying marks put on the blood containers. To further enhance confidentiality, the MMC uses a different staff member to collect the blood than the staff member who matches and tests the blood. Blood is not identified by the donor's name either during storage or when given to the recipient. According to the MMC, assurances of confidentiality are essential to elicit candid responses from donors about their current health and past exposure to disease, such as AIDS or sy-

---

1. Plaintiff's Rule 3(g) statement asserts that the incident lasted approximately 45 minutes. Elsewhere, plaintiff's attorney asserts that, "when Ms. Lapir endeavored to assist ... she did not neglect her cross-matching duties. At the time the July 10 incident commenced, Ms. Lapir had a 15 minute wait for cross-matched blood which was not yet ready for use. Accordingly, the time (less than 10 minutes) which she spent to accommodate the patient's request ... did not serve to delay or interfere" with her duties. *See* Prosnitz letter dated Oct. 6, 1987.

philis. Moreover, MMC believes that, if it could not assure the confidentiality of donor names and test results, many current donors would not donate.

Once donated, blood is generally stored in a common refrigerator until needed and is not identified by race, religion, ethnic origin or any other non-medical classification. The MMC asserts that the policy of generally accepting only homologous, anonymous blood and not allowing any segregation based on race, religion or other grouping is essential to ensure an adequate blood supply to all patients in need.

On June 16, 1986, MMC's blood bank adopted a written policy and procedure to permit designated blood donations as an exception to the general policies outlined above. The new policy dictated that blood can only be segregated if it is either a self-donation or a donation by a family member or friend to a designated patient who the donor knows is in need of blood. Called "a directed donation," such a donation exists only if at the time of donation the donor directs that his blood be used for that specific patient. This blood is then labeled, so as not to be confused with the generic, "homologous" blood pool. MMC's written procedure states that designated donors must donate their blood at least three days prior to use and are subject to all other routine practices of the blood bank.

According to David Bryan, the supervisor of the blood bank during plaintiff's employment there, all blood bank employees have been made aware of the policies with respect to blood donor confidentiality, which have been reemphasized with the advent of AIDS testing of all donated blood. At two meetings, July 31, 1985 and June 30, 1987, at which Lapir was present, these matters were called to the attention of blood bank employees. With respect to the prohibition against sequestering blood, Bryan also states that all blood bank employees were informed that only blood specifically designated for a particular patient may be set aside for that patient.

Two of Lapir's co-workers at the blood bank, Shirley Willoughby and Emmanuel Toussaint, state that they were made aware of the rules relating to confidentiality and designated blood either orally or in writing by either their supervisor or director. Toussaint confirms that Lapir was present at the July 1985 meeting at which blood donor confidentiality was discussed in connection with the new AIDS tests.

Plaintiff does not dispute these assertions concerning her awareness of the hospital's regulations. In fact, Lapir stated in her deposition that she told Sprecher about these rules and at first told Sprecher she could not help him. According to plaintiff, it was only after Sprecher came back with the donor list that Lapir was led to believe that she could help him without violating the rules.

While employed by MMC, plaintiff was represented for purposes of collective bargaining by Local 1199. The terms and conditions of plaintiff's employment at MMC are set forth in a collective bargaining agreement between Local 1199 and the League of Voluntary Hospitals and Homes of New York, Inc., MMC's multi-employer collective bargaining agent, which was in effect from July 1, 1986, through June 30, 1989.

The terms of the collective bargaining agreement provided that the employer could discharge "for cause" and that, if the union decided to contest the discharge, it must give written notice of its intention to do so within five working days. "In such event, the dispute shall be submitted and determined under the grievance and arbitration procedure ... however commencing at Step 3 of the grievance machinery." See Article XXIX, Discharge and Penalties. Article XXXII, Arbitration, provides that within twenty-one days of a Step 3 meeting either party may demand arbitration of an unresolved dispute before the American Arbitration Association.

Shirley Willoughby, plaintiff's union delegate, testified at her deposition that she was present at a preliminary meeting at which both she and plaintiff were first advised as to what plaintiff was being charged with, and where Lapir was given a written statement of the charges. Wil-

loughby recalls that this meeting lasted approximately 45 minutes, that Dr. Alicia Garcia and Mr. Bryan, the director and supervisor of the blood bank, did most of the talking and that plaintiff insisted she had done nothing wrong. Plaintiff testified that she had several meetings with union and MMC representatives prior to the Step 3 meeting, that she talked to Ambrose LaFleur, the Local 1199 organizer, and that she was in regular contact with Willoughby. Lapir stated that on July 21 she was called to a meeting with Garcia, Bryan, Willoughby, and another union delegate. The meeting was interrupted by an emergency and continued on July 23. Lapir acknowledged she was able to explain her side of the story, but at its conclusion MMC read her a written discharge notice.

Following plaintiff's discharge, Local 1199 filed a timely grievance on plaintiff's behalf challenging the discharge. Prior to the Step 3 grievance meeting, Shirley Willoughby and Emmanuel Toussaint, the two Local 1199 delegates representing plaintiff, investigated the July 10 incident. Both Toussaint and Willoughby had been blood bank technicians for more than ten years and were themselves familiar with blood bank procedures. Toussaint stated that he interviewed Bernard, the lead technician, and the blood bank desk clerk, both of whom corroborated MMC's version of the events in question. Toussaint did not talk to Ms. Lombardi (the clerk in the blood donor room) or to Ms. Jackson (the computer clerk) during the course of the investigation. Nor did Toussaint speak to the assistant supervisor, Mr. Matellus.

Toussaint concluded that Lapir had violated MMC rules prohibiting the isolation and selection of blood for a particular patient, except at the direction of the donor. Toussaint also concluded that Lapir had violated the confidentiality rules by disclosing the record of another patient to someone who was a stranger to the blood bank and that Lapir had been present during at least one meeting when the rules with respect to confidentiality were discussed. Toussaint reported to the Local 1199 organizer, Ambrose LaFleur, on the results of his investigation.

Union Delegate Willoughby stated that she interviewed Lapir and talked to the blood bank clerk and Bernard concerning the incident. Union Organizer LaFleur stated that he relied on information relayed to him by the delegates, Willoughby and Toussaint.

On August 11, 1987, a Step 3 grievance meeting was convened to hear the local's grievance on behalf of plaintiff. LaFleur and Willoughby accompanied plaintiff at this meeting. Plaintiff acknowledges that she was afforded a full opportunity to explain why her discharge was improper and that the union argued that she should not be discharged. At her Step 3 grievance hearing, Lapir did not dispute the hospital's factual allegations but justified her conduct by saying she was just trying to help. By letter dated August 11, 1987, MMC informed the union that they would not retract the discharge.

After losing a grievance, the union has 21 days to request arbitration on the matter. As the organizer, LaFleur had the option of initiating arbitration immediately, or of referring the question of arbitration to a Chapter Hearing and Appeals Board made up of union delegates at the MMC. LaFleur testified that, after losing the third step grievance, he looked into the case further and asked Lapir more questions. LaFleur told Lapir that in his view she had a 95 percent chance of losing the arbitration because in his view she had violated hospital policy. LaFleur stated that he decided against arbitration because of this fact and because Lapir had acted without consulting anyone in the department, including her supervisor. LaFleur told Lapir that he would, as a result of his decision, send the case to the Hearing and Appeals Board to review his decision not to pursue arbitration.

At a deposition conducted subsequent to argument of the present motions, plaintiff testified that, at the end of her conversation with LaFleur, they briefly discussed Fred Gilliam, a vice president of the union. According to plaintiff, LaFleur told her

that Gilliam had told him to "stay away from the case." [2]

On September 1, 1987, the MMC chapter Hearing and Appeals Board convened to hear plaintiff's appeal of the union's decision not to submit the grievance to arbitration. Five MMC delegates, none of whom were employees from the blood bank, heard plaintiff's appeal. The board asked Lapir to explain what happened and to present her side of the story.

David Abels, one of the members of the Board, testified that the Board had not interviewed the supervisor to determine whether he knew what Lapir was doing, and to his knowledge, no one from the union had interviewed Ms. Jackson or Ms. Lombardi. However, Abels stated that the board does not generally do an investigation or interview witnesses as part of its determination. Aside from the employer's termination notice, the board members rely on what the employee tells them. In order to hear Lapir's version without risk of prejudice, the board did not request any written evaluation from either LaFleur or Willoughby. As Abels explained, "Our sole job is to get the documents from the administration.... We defend union members. We make every effort to defend the union member. We make sure that we leave no stone unturned in our proceeding in interviewing the employee." Abels also stated that Lapir had never requested that the board interview witnesses or that Jackman or Lombardi be called.

Abels testified that he did not know of any written regulations that Lapir violated. However, Abels also stated that "[t]here are regulations that are not written but, by protocol and common sense, you should know to follow it. Patient confidentiality was one of them. We felt that was broken." Both Abels and Roy Jaffe, another board member, testified that the board was impressed by the fact that Lapir admitted that she bypassed her supervisor and that it was clearly improper for her to under-

take to comply with Sprecher's request without consulting the supervisor. In a decision rendered on September 1, 1987, the MMC Chapter and Appeals Board voted, by 4 to 1, to deny plaintiff's appeal.

Plaintiff argues that the deposition of Abels demonstrates personal animosity toward Lapir based on evidence that Abels made a statement that in his opinion what Lapir had done in aiding an orthodox Jew obtain blood from the Bikur Cholim account was "morally wrong and racist to a degree."

After denial by the Hearing and Appeals Board, a union member has a right to request a review by the division Hearing and Appeals Board. The union constitution provides that a member requesting division review of a chapter board decision must file a written request within 48 hours of the chapter decision. LaFleur testified that immediately following the Board's September 1 decision, LaFleur informed Lapir that she could still appeal to the division at union headquarters and that LaFleur would help her set up this process. During her deposition, plaintiff stated that she was told that she could appeal the decision and of a time frame in which to appeal.[3] In any event, plaintiff never contacted LaFleur or any other union official but instead decided to retain an attorney. The first written communication on plaintiff's behalf was a letter from her counsel on October 6, 1987, more than 35 days after the decision, which asked for reconsideration of the union's decision not to arbitrate.

## DISCUSSION

■ Plaintiff alleges that MMC breached the collective bargaining agreement by terminating plaintiff's employment without good cause and that the union's failure to process plaintiff's grievance through arbitration constitutes a breach of its duty of fair representation. Plaintiff has standing to bring her section 301 action against the

---

2. Plaintiff first informed defendants and the Court about this comment at the hearing on the summary judgment motion on March 8, 1990.

3. Plaintiff's affidavit in opposition, however, asserts that she was never told of any time limit. There is evidence that LaFleur told plaintiff that she had fifteen days to appeal.

employer and the union based on a breach of the collective bargaining agreement only if the union has breached its duty of fair representation. *Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

█ Two elements must be proved to establish a breach of the statutory duty of fair representation. First, the union's conduct must have been "arbitrary, discriminatory or in bad faith." *Barr v. United Parcel Service, Inc.,* 868 F.2d 36, 43 (2d Cir.), *cert. denied* — U.S. —, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989), *quoting Vaca v. Sipes,* 386 U.S. at 190, 87 S.Ct. at 916. Second, the union's conduct must in fact have "seriously undermine[d] the arbitral process." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 567, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976); *Barr,* 868 F.2d at 43. It is well established that while "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion," an employee does not have an absolute right to have his or her grievance taken to arbitration. *Vaca v. Sipes,* 386 U.S. at 191, 87 S.Ct. at 917. In the present case, plaintiff asserts that the union's conduct was arbitrary and capricious, and tainted by personal hostility and bad faith.

█ Summary judgment may be granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In a duty of fair representation case, it is not enough to question the union's wisdom in not proceeding to arbitration. *Helmer v. Briody,* 721 F.Supp. 498, 504 (S.D.N.Y.1989). "In order to survive [a] summary judgment motion, the plaintiff ... must set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty, or arbitrary exercise of discretion.... Conclusory allegations, without specifying supporting facts to show a union's lack of good faith, fail to state a valid claim." *Spielman v. Anchor Motor Freight, Inc.,* 551 F.Supp. 817, 822 (S.D.N.Y.1982); *see also* Fed.R.Civ.P. 56(e); *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983).

### Claim of Arbitrary and Capricious Conduct

█ Plaintiff asserts that the union failed adequately to investigate the July 10 incident and failed to develop several defenses on plaintiff's behalf and that these failures establish a breach of the duty of fair representation. Several courts have held that where a union's investigation is so grossly inadequate as to transcend negligence and poor judgment, the union has breached its duty. *See, e.g., Tenorio v. NLRB,* 680 F.2d 598 (9th Cir.1982). Moreover, a union's handling of an employee's grievance must meet certain minimum standards of competence and fairness. *Lopez v. McLean Trucking Co.,* 798 F.2d 611 (2d Cir.1986). Thus, this circuit has ruled that, even in the absence of evidence of bad faith, union decisions made without a rational basis may still be attacked as arbitrary. *Jones v. Trans World Airlines, Inc.,* 495 F.2d 790 (2d Cir.1974).

█ Plaintiff complains that the union's failure to interview the donor or computer room clerks constitutes unfair representation. However, even today, plaintiff is unable to point to any information possessed by these clerks that would have justified or mitigated plaintiff's misconduct. No claim is made that these clerks had authority to alter the hospital's regulations or that they in fact told plaintiff that she could proceed as she did.

Plaintiff further complains of the union's failure to ascertain whether plaintiff had violated any written regulations and failed to defend plaintiff on the ground that the rules she violated were unwritten. As far as lack of investigation is concerned, plaintiff has not shown that further investigation would have established that her conduct was permitted under written procedures. The fact that the rules do not deal explicitly with blood donor clubs was generally recognized. The union's failure to make more of a defense out of the fact that there were no written regulations dealing explicitly with the situation plaintiff confronted is certainly not unreasonable. Plaintiff's present position is not that she

was uncertain as to whether the hospital's rules prohibited compliance with Dr. Sprecher's request but, rather, that she was misled by the actions of the donor room clerk and the silence of her supervisor.

Likewise, the union's alleged failure to make more of the fact that the assistant supervisor did not step in to prohibit plaintiff from proceeding was not arbitrary under the circumstances. Plaintiff acknowledged that she did not ask nor inform her superior of what she was doing, although he was present and although she herself believed that hospital regulations prohibited her from granting Sprecher's request. In the circumstances, the tactical decision of the union not to try to place the blame on the supervisor for failing to stop Lapir when she decided on her own that Sprecher's obtaining the donor list authorized her to depart from the rules is at least a rational, if not the right, decision.

Plaintiff also asserts that the union failed to ascertain and develop a defense based on the fact that other employees involved in the incident were not disciplined. The claim is frivolous. By plaintiff's own admission, she directed Sprecher to the blood donor room, where he informed Lombardi that a blood bank technician required the list. Lombardi's role in printing out the list and bringing it to Lapir, a technician who presumably had a valid reason for the list, can hardly be equated with plaintiff's role in the events. Similarly, there is no evidence presented to this Court that Jackman knew what plaintiff was doing. As a consequence there is no reason to fault the union for failing to argue that one union member should be absolved of responsibility or punished less severely because others were not punished at all.

Plaintiff's claim that as a whole the union's investigation and defense of her during the grievance procedure were inadequate must also be rejected. With regard to the alleged inadequacy of the investigation, plaintiff has failed to show that a more adequate one would have produced information which would have affected the outcome.

With regard to the adequacy of the union's defense, the record hardly supports a conclusion that the union's representation "amounted to conduct and omissions 'so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.'" *Barr, supra,* 868 F.2d at 43, *quoting NLRB v. Local 282, International Bhd. of Teamsters,* 740 F.2d 141, 147 (2d Cir.1984). At the Step 3 grievance, the union basically took the position that discharge was an excessive remedy. Given the lack of persuasiveness of plaintiff's claims that the blood bank regulations were at fault for not explicitly prohibiting her conduct, that her supervisor misled her by not prohibiting her from doing what she did, and that the donor room technician led her to believe that her conduct was permissible, the union's position was far from arbitrary.[4]

In *Barr,* plaintiff similarly asserted that the union had breached its duty by refusing to present Barr's witnesses at the step 1 or 2 meetings and by failing to prepare adequately for the meetings. The court concluded that, while these decisions might have affected the final outcome of the arbitration, they did not rise to the level of bad faith and arbitrariness. As the court explained:

"Tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach.... As long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by ration-

---

**4.** Plaintiff's contention that hostility or malice may be inferred from the comment of a union vice president to the union organizer, LaFleur, who was considering whether to pursue arbitration, that LaFleur should "stay away from the case" must be rejected. Nothing in either the wording or circumstances surrounding the comment provides a basis for placing a sinister interpretation on the statement. On the face of it and in the circumstances, it appears at least equally plausible to infer that the statement resulted from a rational assessment of the merits of pursuing arbitration of plaintiff's grievance.

ally founded decisions which operate to their particular disadvantage."

868 F.2d at 43–44, *quoting Cook v. Pan American World Airways, Inc.*, 771 F.2d 635, 645 (2d Cir.1985), *cert. denied*, 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986).

■ Plaintiff's claim that the decision not to arbitrate her grievance violated the union's duty likewise fails to raise a material issue. It is well established that, where, as here, the union has made an informed decision that a grievance is not meritorious, plaintiff has no right to arbitration. *Vaca v. Sipes*, 386 U.S. at 191, 87 S.Ct. at 917; *see also Wozniak v. U.A.W. Local 897*, 842 F.2d 633, 636 (2nd Cir.1988) ("There is no arbitrariness in failing to process a bad case."). "A union has wide discretion to determine in good faith when pursuit of an individual's grievance would be fruitless." *Tolentino v. Erickson*, 525 F.Supp. 812, 816 (E.D.N.Y.1981); *see also Helmer v. Briody*, 721 F.Supp. 498, 504 (S.D.N.Y. 1989). Absent a showing of arbitrary conduct or bad faith, a court should not second guess the union's decision not to pursue plaintiff's grievance to arbitration. *Cook v. Pan American World Airways, supra*, 771 F.2d at 645. Plaintiff's position that she decided to act on Dr. Sprecher's request because the donor room clerk did so and plaintiff's supervisor failed to stop them presented the union with the kind of "bad case" that a union may rationally decline to take to arbitration.

### Plaintiff's Claim of Hostility and Bad Faith

■ Hostility, malice or racial animus toward an employee on the part of a union may constitute a breach of the duty of fair representation. *Jones v. TWA*, 495 F.2d 790 (2d Cir.1974); *Hammons v. Adams*, 783 F.2d 597 (5th Cir.1986). Plaintiff asserts that the deposition comments of Mr. Abels, one of the delegates on the Board of Appeals, demonstrates that he harbored animosity toward plaintiff. While inferences

of discriminatory intent or malice are generally best left to a jury, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989), plaintiff has not raised a material question of fact with respect to this issue.

Plaintiff first broached this claim of hostility and bad faith in her answering papers to the current motion. It should also be noted that plaintiff does not assert any racial or religious animus motive on the part of Abels, himself an orthodox Jew, toward Lapir, herself a Jew. Plaintiff alleges hostility based on Abels' statement at his deposition in this action that her conduct was "immoral" and "partly racist." However, a comment of this sort about another person's character is not evidence of personal animosity unless it is so lacking in a rational foundation or so uncalled for that no inference is permissible except that the speaker harbors ill-will towards the person whose character is being discussed. That is not the situation here.

For the foregoing reasons, defendants' motions for summary judgment are granted.[5]

The Clerk is directed to enter judgment dismissing the complaint and to mail a copy of the within to all parties.

SO ORDERED.

---

**5.** Given the Court's determination on the issue of fair representation, defendants' respective assertions that plaintiff did not exhaust her internal union remedies and was fired for cause are not addressed.