**Leonard GOLD, Plaintiff,**

v.

**LOCAL UNION NO. 888, U.F.C.W., A.F. L.–C.I.O., United Food and Commercial Workers International Union, AFL– CIO and CLC, and John Hancock Mutual Life Insurance Company, Defendants.**

**No. 87 Civ. 8291 (KMW).**

United States District Court, S.D. New York.

March 12, 1991.

Jay Kushner, Altieri, Kushner, Miuccio & Frind, P.C., New York City, for plaintiff.

Neal I. Korval, Vedder, Price, Kaufman, Kammholz & Day, New York City, Charles I. Cohen, George M. MacDonald, Vedder, Price, Kaufman, Kammholz & Day, Washington, D.C., for defendant John Hancock.

Richard Roesel, United Food & Commercial Workers Intern. Union, Washington, D.C., Sheldon Engelhard, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for defendant UFCW.

KIMBA M. WOOD, District Judge.

Defendant, John Hancock Mutual Life Insurance Company ("the Company"), moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on plaintiff's claim that the union breached its duty of fair representation.[1] The United Food and Commercial Workers International Union, and Local Union No. 888, UFCW–AFL–CIO (collectively "the union") move to dismiss the Company's cross-claim.

### Facts

The facts underlying this motion are undisputed, except where noted. The Company discharged plaintiff, Leonard Gold, an employee for 29 years, because of accusations that Gold had stolen money from an elderly policyholder. The Company first learned of these allegations on March 4, 1986 when a Mr. Frankel, plaintiff's superi-or and a district manager for the Company, received a phone call from Christine Abate, asking if Frankel would meet with her to discuss a complaint she had about the way plaintiff Gold handled policies for a friend of hers, Mrs. Carolyn Bush. Several days later, Frankel met with Abate and Bush. At the meeting, Abate claimed that even though Bush's premiums amounted to only $39.64 per month, Gold came over to Bush's house each month and had her sign over her entire $70 pension check. According to Abate's allegations, Gold gave Bush neither change nor a receipt for the transaction. When questioned by Frankel, Bush confirmed these allegations.

Later that day, Frankel informed Gold of the allegations, but did not meet with him. Gold then went to speak with Bush. Abate was not present. While Gold was in her house, Bush called Frankel and told him that Gold was innocent of any wrongdoing, and that everything was fine between her and Gold. Gold returned to the office late that afternoon and told Frankel that he was innocent, and that the problem with Bush could be attributed to her senility. Gold also gave Frankel a note allegedly signed by Bush exonerating Gold.

The next day, Frankel spoke again with Bush's friend, Abate, who told Frankel that when plaintiff visited Bush on March 6, 1986, he told her that there had been a mistake with her account and gave her $360 in cash. Abate also maintained that Bush gave Gold the note exonerating him only after he told her that unless she did so he would go to jail. One week later, the Company received at its Boston headquarters a letter signed by Bush (although not drafted by her) repeating Abate's allegations that Gold had taken Bush's entire pension check every month without giving her change or receipts and adding the allegations regarding Gold's visit and his payment to her of $360. Soon thereafter, the

---

1. Plaintiff originally commenced this action against both the union defendants as well as the Company. By stipulation dated December 20, 1989 and approved by this court, however, plaintiff settled his dispute with the union defendants and dismissed the case against them. Soon thereafter, the Company filed a cross-claim against the union defendants pursuant to F.R.Civ.P. 13(g). *See infra.*

Company suspended Gold with pay, pending the outcome of an investigation.

After completing his investigation, Frankel wrote to Edward Ciavolino, a Company vice-president, summarizing the allegations against Gold and his findings. In this letter, Frankel stated that Gold had admitted to him that he had given Bush some money (Gold denies making this admission), but that Gold had declined to indicate how much money he gave to Bush. Ciavolino asked the Company's Department of Special Activities to conduct its own investigation into the allegations made by Abate and Bush. During the course of his investigation, the Company investigator spoke with Bush, Abate, Gold, and Frankel. His report credited Bush and Abate's allegations, even though the investigator noted that Gold consistently maintained his innocence. Following receipt of the investigator's report, the Company decided to terminate Gold's employment. Frankel informed Gold of the Company's decision, telling him it simply did not believe his claim of innocence.

On April 30, the union formally submitted a grievance on Gold's behalf. The Local Union represented Gold through the first three steps of the grievance process, at which it was unsuccessful in persuading the Company to reverse its earlier decision to terminate Gold's employment. At the fourth step meeting (the last before arbitration), Andre Henault of the International Union took over the task of representing Gold. In preparing for the fourth step meeting, Henault reviewed a report of the third step meeting prepared by a union official familiar with Gold's case, but did not speak with that official, nor did he speak with anyone else involved in the case. After the meeting, Company officials again denied Gold's grievance, and the union filed a notice of intent to submit Gold's grievance to arbitration.

Sometime after the first fourth step meeting, Henault learned of a settlement offer made by the Company. He asked that the Company convene another fourth step meeting to discuss Gold's case, and that this time the discussions include the settlement offer. The second fourth step meeting took place nearly ten months after the first. At that meeting, Company officials again refused to overturn the termination decision, and told union officials that any settlement offer that may have been extended had been withdrawn. Henault did not take part in the discussion of Gold's case at this meeting, however, because Henault arrived after the participants had already moved on to other matters on the agenda for that day.

Following this second fourth step meeting, the union took another look at Gold's case and withdrew its previously filed notice of intent to arbitrate. In November of 1987, plaintiff filed this action.

I. Motion of Defendant John Hancock for Summary Judgment

 Plaintiff alleges that the Company breached the collective bargaining agreement by terminating plaintiff's employment without good cause and that the union's failure to adequately investigate Gold's grievance and take it to arbitration constitutes a breach of the duty of fair representation. Plaintiff has standing to bring such an action against the Company based on a breach of the collective bargaining agreement only if the union has breached its fair duty of representation. *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). The Supreme Court has made clear that as part of this duty a union "may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." *Id.* at 191, 87 S.Ct. at 917. Yet, a union member has no absolute right to have his or her grievance taken to arbitration. *Id.* In *Barr v. United Parcel Service, Inc.*, 868 F.2d 36, 43 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989), the Second Circuit recently set forth a two part test for duty of fair representation claims: "The union's conduct must, first, have been 'arbitrary, discriminatory or in bad faith,' and second, it must have 'seriously undermined the arbitral process.' [citations omitted]." Several courts have held that the failure to fairly and adequately pursue an investigation of a grievance may satisfy this test and con-

stitute a breach of the duty of fair representation, for this failure may undermine the integrity of the arbitral process. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567, 96 S.Ct. 1048, 1057, 47 L.Ed.2d 231 (1976); *Tenorio v. NLRB*, 680 F.2d 598, 601 (9th Cir.1982); *Lapir v. Maimonides Medical Center*, 750 F.Supp. 1171 (E.D.N.Y.1990). In addition, several decisions in this circuit have fleshed out the meaning of the term "arbitrary" as used in *Barr* and the decisions upon which it relied. Thus, the Second Circuit stated that evidence of "an irrational decision" by the union may be sufficient to constitute a breach of its duty even in the absence of bad faith. The court held that "bad faith or hostile discrimination, is certainly a sufficient condition to evidence an irrational decision, but it is not a necessary condition. It is also sufficient that a distinction be arbitrary or not based on some rational consideration." *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 798 (2d Cir.1974); *Caputo v. National Ass'n. of Letter Carriers*, 730 F.Supp. 1221 (E.D.N.Y.1990).

Defendants argue that plaintiff cannot meet the burden imposed on him by the law, stating that he "is incapable of establishing that, in processing his grievance and deciding not to take it to arbitration, the Union acted in an arbitrary manner or in bad faith." Defendants' Memorandum of Law in Support of Joint Motion for Summary Judgment ("Def. Mem.") at 2. The crux of plaintiff's response is that the union's decision not to arbitrate, made without an independent and adequate investigation, is *per se* arbitrary and thus a breach of the duty of fair representation.

To survive a motion for summary judgment, a plaintiff alleging a breach of the duty of fair representation must "set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty or arbitrary exercise of discretion." *Spielmann v. Anchor Motor Freight*, 551 F.Supp. 817 (S.D.N.Y.1982); *Helmer v. Briody*, 721 F.Supp. 498 (S.D.N.Y.1989). Applying this set of standards to the facts of this case, the question facing the court is whether Gold has alleged sufficiently concrete facts from which this court could reasonably infer that the union handled plaintiff's grievance in an arbitrary fashion and whether or not the union based its actions on some "rational consideration."

A review of the union's handling of Gold's case in light of this standard reveals sufficiently concrete facts from which one can infer that the union represented Gold in an arbitrary and perfunctory manner, particularly at the two critical fourth step meetings. The fourth step of the grievance procedure represents the grievant's last chance for convincing his employer to reconsider its termination decision. The next step is arbitration before an impartial arbitrator. Yet, in spite of the importance of a fourth step meeting for the grievant, Andre Henault, the union official charged with representing Gold at the two fourth step meetings, arrived at the second meeting only *after* discussion of Gold's case had passed. Following this meeting, the union reviewed Gold's case, presumably intending to rethink its decision to proceed to arbitration. In making this decision, Henault reviewed Gold's case file, but did not conduct any investigation of his own and did not speak with those union officials most familiar with the case and most supportive of Gold's claims of innocence. Indeed, Henault conducted no additional investigation whatsoever of Gold's grievance beyond reading the file. Based on this review of the evidence, and vague and unsubstantiated information that, somewhere, in the late 70s or early 80s, the union had lost a similar case, the union withdrew its notice of intent to arbitrate, ending Gold's chances for relief under his collective bargaining agreement. His union offered Gold no explanation for its change of position.

Henault's cursory treatment of Gold's case at the second fourth step meeting and during the reevaluation of the arbitration decision was characteristic of the manner in which he treated the case during the entire time he had responsibility for it. Henault took over the case before the first fourth step meeting. His preparation for that crucial meeting consisted of 40–45 minutes of reading the file sent to him by

the local union. Exh. A to Wolin Affirmation in Opp. to Motion for Summary Judgment (Henault Dep.), at 21. Henault failed to call the Local official who had prepared the third step report, and indeed, did not speak with any Local official familiar with the case. Nor did Henault or anyone else from the International Union invite any of the local union officials involved in the first three steps to the fourth step meeting. Plaintiff's Memorandum of Law in Opp. to Motion for Summary Judgment, at 16–17.

There is no need for further review of plaintiff's numerous allegations against the union, because in deciding a motion for summary judgment, the role of the district court "is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, the court takes no position on whether the union's handling of plaintiff's grievance was in fact a breach of its duty of fair representation. At this stage of the proceedings, however, plaintiff has raised sufficient questions to merit a chance to prove his allegations at trial. He has produced evidence based on which a jury could reasonably find for the plaintiff, thus precluding summary judgment. The Company's motion for summary judgment is therefore denied.

## II. Motion of Union Defendants to Dismiss Cross–Claim of Defendant John Hancock Insurance Co.

Having denied the Company's motion for summary judgment, the court must reach the issues raised by the union defendants' motion to dismiss the cross-claim filed by the Company against them. On December 20, 1989, this court approved separate orders discontinuing plaintiff's case against the two union defendants as part of a settlement agreement. On December 29, 1989, the Company filed a cross-claim against the two union defendants, seeking "simply to preserve the status quo ante." Opp. of Defendant John Hancock to Motion to Dismiss Cross–Claim, at 4. The unions argue that the Company's cross-claim is barred because: (1) it was filed without leave to amend as required by F.R.Civ.P. 15(a); (2) it violates the scheduling order of this court issued January 20, 1989 which provided that "no additional causes of action or defenses may be asserted after February 1, 1989"; and (3) the cross-claim fails to state a claim upon which relief can be granted.

█ The Company's reasons for asserting its cross-claims at this late date center on two sets of concerns. The first involves the unions' "expedient, settlement-induced withdrawal of its earlier denials and its failure to agree to make its officials available to John Hancock on the same basis as for Gold." Opp. to Motion to Dismiss, at 5. In other words, the Company is worried that the effect of the settlement will be to grant potential union witnesses "non-party" status for purposes of their availability at trial. *Id.* at 9. The Company cites no authority for this novel use of Rule 13(g), and the court believes that Rule 13(g) cannot be used for this purpose.

Secondly, the Company fears "the potentially unforeseen effects" of language in a Supreme Court decision, *Bowen v. United States Postal Service*, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983), on the payment of any damage award in this case. Because the Company does not spell out the nature of these "potentially unforeseen effects," this court can only guess what the Company has in mind. In its Memorandum in Opposition, the Company suggests that the reasoning of the *Bowen* footnote, if adopted by this court, might somehow cause the Company to pay more in damages if the union is dismissed than they would if the union remains as a defendant. The Company also suggests that the settlement between plaintiff and the union will alter the elements of the case plaintiff must prove. *Bowen*, however, does not require either result. *Bowen* dealt with how courts should apportion damages between a union and an employer in hybrid § 301 actions, such as this case. The Court held that any damage award must be apportioned between the employer and the union in proportion to the responsibility of

each; neither is liable for damages attributable to the fault of the other. In a footnote to the majority decision, Justice Powell stated that the union's breach "does not absolve the employer of liability. Thus if [the employee] does not collect damages apportioned against the Union, the [employer] remains secondarily liable for the full loss of backpay." *Id.* at 223 n. 12, 103 S.Ct. at 595 n. 12. While this footnote does seem to run counter to the rationale underlying the rest of the decision, it deals only with an event not present here—a plaintiff's failure to collect damages from the union that were apportioned against the union. Here, the union has satisfied Gold's claim against the union. *See, e.g.,* Unions' Reply to John Hancock's Motion to Dismiss, at 2. There is no danger that the Company will be forced to pay any damages for which the union is responsible, because the union is liable only secondarily, and not jointly and severally, for damages stemming from its breach of duty. This secondary liability does not come into play where, as in this case, the plaintiff has already collected from the union. *Niro v. Fearn Int'l., Inc.*, 827 F.2d 173, 179 n. 3 (7th Cir.1987).

Similarly, neither *Bowen* nor the settlement between plaintiff and the union alters the requirements for proving a fair representation claim. Plaintiff must still prove that the union breached its duty of fair representation before he can proceed with his breach of contract action against the Company. "The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both." *DelCostello v. Int'l. Bhd. of Teamsters*, 462 U.S. 151, 165, 103 S.Ct. 2281, 2291, 76 L.Ed.2d 476 (1983). The union's decision to settle with plaintiff may make the employer's defense of the suit more difficult, but it does not fundamentally change it.

Even if the court chose to treat the Company's papers opposing the unions' motion to dismiss the cross-claim as a motion for leave to amend pursuant to F.R.Civ.P. 15(a), or an attempt to show good cause pursuant to the provision of this court's scheduling order that allows amendments for good cause shown, the Company does not satisfy the requirements for either. The motion of the Union defendants to dismiss the cross-claim is hereby granted.

### Conclusion

For the reasons set forth above, the Company's motion for summary judgment is denied. The union defendants' motion to dismiss the cross-claim is granted. The parties are directed to submit a joint pretrial order by April 12, 1991. The case will be placed on the ready trial calendar as of April 16, 1991.

SO ORDERED.