## Kurt J. MURPHY

v.

## AIR TRANSPORT LOCAL 501

### No. 3:97CV2394JBA.

United States District Court,
D. Connecticut.

June 22, 2000.

---

Patrick Tomasiewicz, Fazzano & Tomasiewicz, West Hartford, CT, for Kurt J. Murphy.

Gregg D. Adler, Livingston, Adler, Pulda & Meiklejohn, Hartford, CT, Patrick W. Shea, Sarah Elizabeth Graves, Paul, Hastings, Janofsky & Walker, Stamford, CT, Joel C. Glanstein, O'Donnell, Schwartz, Glansten & Rosen, New York, NY, for Air Transport Local 501.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 61]

ARTERTON, District Judge.

### I. *Preliminary Statement*

Plaintiff Kurt J. Murphy brings this action against Defendant Air Transport Local 501 ("Local 501" or "union") alleging breach of the union's duty of fair representation in its representation of him before a three-member arbitration panel regarding his termination. Before the court is Defendant Air Transport Local 501's motion for summary judgment pursuant to Fed. R.Civ.P. 56.

### II. *Factual Background*

Accepting all facts alleged by the plaintiff as true, the summary judgment record discloses the following narrative. Plaintiff was employed by American Airlines as a fleet service clerk from June 1, 1987 to July 12, 1996. At all times relevant to this matter Defendant, Air Transport Local 501, acted as collective bargaining agent for all American Airlines fleet service

clerks pursuant to a collective bargaining agreement entered into on August 15, 1995. The Plaintiff's employment with American Airlines was terminated on June 15, 1996, when the results of a drug test indicated that Plaintiff tested positive for cocaine use. Plaintiff unsuccessfully challenged his dismissal through grievance proceedings set forth in the collective bargaining agreement.

It is undisputed that on June 14, 1996, Plaintiff reported for work at approximately 11:19 P.M. for a shift that began at 11:30 P.M. At approximately 12:15 A.M., Plaintiff told his crew chief, Rajinder Chaddha, that he was going to Dairy Mart, and asked Chaddha if he would like to come. *See* Hearing Tr. at 119. Chaddha joined Plaintiff for the trip. En route, Chaddha asked Plaintiff if they could stop at Jake's Restaurant, as he needed to speak with a friend. Murphy agreed, and he and Chaddha entered the bar area of Jake's, where Murphy ordered sodas for Chaddha and himself.

While in Jake's, Plaintiff was confronted by two American Airlines supervisors, Yvonne Strang and David Stillwagon, who had followed Chaddha and Murphy to Jake's in the course of an investigation of "partying" on the night shift. When confronted, Plaintiff was sitting at a booth with an open, half empty beer bottle on the table in front of him. Stillwagon asked Murphy what he was doing off site, and Murphy told him that he had arranged a "CS" (changed shift) with another employee, although he acknowledged the CS was not recorded (the employee later told Strang that she had not discussed a CS with Murphy). Stillwagon also questioned Murphy as to why he took a lunch break within half an hour of beginning his shift, when the collective bargaining agreement required such breaks to occur three hours after the beginning of his shift.

Because of this, along with the fact that Plaintiff was in company uniform in public with an open alcoholic beverage in front of him, Stillwagon determined that Plaintiff should be tested for alcohol and drug use. The American Airlines policy states that "[i]n all cases where the Company has reasonable suspicion to believe that an employee is in violation [of rules regarding the use of intoxicants], the employee's Department Management representative will *require* the employee, as a condition of continued employment, to cooperate and undergo drug and alcohol testing." Ex. L (emphasis in original).

Plaintiff took a breathalyser test (to test for alcohol use) and submitted a urine sample for drug testing. Plaintiff passed the Breathalyser test, but his urine sample tested positive for cocaine. As a result, Plaintiff's employment with American Airlines was terminated on July 12, 1996. Plaintiff appealed the dismissal pursuant to the collective bargaining agreement between American Airlines and Air Transport Local 501 ("Local 501"). An arbitration hearing was held on March 27, 1997. David Virella, a Local 501 official, represented the Plaintiff at the hearing.

### Arbitration Hearing

The transcript of the arbitration indicates that Virella introduced 10 exhibits, including the portions of the Code of Federal Regulations relating to the collection procedures for drug testing. American called Strang; the manager of the drug and alcohol testing program at American, Tammy Hardge; Steve Van Nus, a manager at the laboratory that performed the drug tests; and Dr. James Yannou, the Medical Review officer who interpreted Murphy's drug test results. The union called Murphy; Chaddha; Stephen Mikelis, an expert in specimen collection procedures; and as a hostile witness, Sarah Graf, the company medical assistant in charge of the collection procedure. Virella objected to several lines of questioning and exhibits on hearsay grounds, and conducted voir dire with respect to one exhibit. Virella's questioning of the witnesses and his opening and closing statement emphasized issues regarding the chain of custody of Mr. Murphy's specimen, the negative

results of two hair follicle tests conducted before and after Murphy's termination, and the company's lack of reasonable suspicion.

On May 16, 1997, approximately a month and a half after the completion of the arbitration hearing, the neutral arbitrator issued her decision. She found "serious problems with [M]r. Murphy's credibility," and concluded that he "used poor judgment and misrepresented the facts in his explanation of why he left his work area thirty minutes after the beginning of his shift." Ex. 4 at D00189. She also concluded that despite the Union's arguments regarding flaws in the handling of the specimen, "they did not break the chain of custody and were not significant enough to merit setting aside the test results," because "[t]he Union relied on a mistaken idea that any error invalidates the chain of custody." *Id.* at D00193. She therefore upheld Murphy's dismissal as a valid termination for cause. Plaintiff then filed this lawsuit, and Local 501 now moves for summary judgment.

### III. *Standard for Summary Judgment*

A grant of summary judgment under Rule 56 is proper when "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no material issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to show that no genuine dispute of material fact exists. *See Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 86. The function of the trial court in considering a motion for summary judgment is to determine if there are issues of fact to be resolved by the fact finder at trial. In doing so, the court must assess the record in the light most favorable to the non-moving party by drawing all inferences and resolving all ambiguities in favor of the non-movant. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996).

The court must then determine if a reasonable trier of fact could find in favor of the non-moving party. *See Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993).

### IV. *Discussion*

#### A. *Duty of fair representation*

To show that a union breached its duty as the exclusive bargaining representative of a union member, a plaintiff must establish two elements. First, the plaintiff must show that the union's actions were arbitrary, discriminatory, or in bad faith. *See Barr v. United Parcel Service, Inc.,* 868 F.2d 36, 43 (2d Cir.1989). Second, the plaintiff must show that the union's conduct "seriously undermined the arbitral process". *Id.* The second prong thus requires that Plaintiff establish a causal connection between his injuries and the union's conduct. *See Spellacy v. Airline Pilots Association–International,* 156 F.3d 120, 126 (2d Cir.1998). It is well settled that negligence will not give rise to a breach of a union's duty of fair representation. *See United Steelworkers v. Rawson,* 495 U.S. 362, 373, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1989); *Barr,* 868 F.2d at 43. The Second Circuit has noted that unintentional conduct not calculated to harm union members may violate a union's duty of fair representation, but only if that conduct is "so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *Cruz v. Local Union No. 3 of Intern. Broth.,* 34 F.3d 1148, 1153 (2d Cir.1994) (internal quotations omitted). It is clear that tactical errors, and errors of judgment, made by union representatives will not give rise to a breach unless they are arbitrary or made in bad faith. *See Barr,* 868 F.2d at 43–44; *Cruz,* 34 F.3d at 1153. However, if a union "arbitrarily ignores a meritorious claim or processes it in a perfunctory fashion," *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the union will be found to have violated its duty of fair representation.

The above discussion demonstrates that plaintiff's ultimate burden is a demanding one, as "[j]udicial review of union action... must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibility." *Spellacy*, 156 F.3d at 126 (internal citations omitted). In analyzing fair representation cases, courts have construed the duty narrowly "[b]ecause unions must retain discretion to act in what they perceive to be their members' best interests." *Galindo v. Stoody Co.*, 793 F.2d 1502, 1514 (9th Cir.1986). Given the national "employees' collective interest in having a strong and effective union," the claims of the individual employee must sometimes bow to the interests of the union membership as a whole. *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1273 (9th Cir.1983) ("Because the union must balance many collective and individual interests when it decides whether and to what extent to pursue a particular grievance, courts should accord substantial deference to the union's decisions.")

In addition, the fact that an arbitration award entered in Mr. Murphy's case implicates the strong federal policy in favor of private resolution of disputes under a collective bargaining agreement. Were the plaintiff successful on his claim, the decision of the arbitrator by whose decision the parties contractually agreed to be bound would be set aside. *See, United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Absent any arbitrary, discriminatory or bad faith conduct on the part of the union, district courts in fair representation cases

> should not undertake to review the merits of arbitration awards but should defer to the tribunal chosen by the parties finally to settle their disputes. Otherwise, 'plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final.'

*Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), *quoting United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

### B. *Conduct said to breach the duty*

Plaintiff contends that a reasonable jury could find that the standard for breach of the duty of fair representation has been met in this case, because Virella processed the plaintiff's grievance in perfunctory manner and failed to present meritorious arguments, therefore undermining the arbitral process. In particular, plaintiff complains that Virella failed to return numerous phone calls and pages in the months leading up to arbitration; that Virella's consumption of an alcoholic beverage prior to making his closing argument at the arbitration hearing impaired his ability to represent Mr. Murphy and demonstrates his lack of concern for plaintiff's case; and that based on his friendship with the plaintiff, Virella did not consider himself obligated to pursue Mr. Murphy's grievance with the same diligence and conviction with which he pursued other cases. *See* Pl. Mem. in Opp. at 27. Plaintiff further challenges Virella's conduct in the hearing itself, arguing that his withdrawal of a question regarding the possibility that a hypodermic needle was inserted into the specimen container, his failure to pursue an argument that the initial test of plaintiff was not based on reasonable suspicion, and his failure to argue that breaks in the chain of custody violated applicable Department of Transportation regulations demonstrated arbitrary and bad faith conduct, in dereliction of the union's duty of fair representation.

Defendant argues that the only reasonable interpretation of the undisputed facts adduced by plaintiff is that Local 501 diligently and professionally represented Murphy, and as such it should be granted summary judgment. Defendant claims that Virella carefully considered all of

Murphy's suggestions and acceded to some of them, such as Murphy's request to introduce hair follicle drug tests at the hearing; allowed a representative of a local nurse's union with which Murphy's wife was affiliated to participate in the arbitration, again at Murphy's request; spoke with plaintiff by telephone "at least" 36 times, although plaintiff paged him on average three to five times a day, more than any other grievant in his experience; reviewed Department of Transportation Regulations and chain of custody forms; and met with plaintiff six times, at least once at plaintiff's house, in preparation for the hearing. Defendant further argues that Virella, a non-lawyer, made reasonable strategic choices at the hearing regarding what evidence and witnesses to introduce and what lines of questioning to pursue; made all the arguments requested by Murphy; obtained numerous concessions from the Company's witnesses at the hearings regarding chain of custody and reasonable suspicion issues; and presented an expert on drug testing collection procedures, as requested by plaintiff. Even if the above conduct was arbitrary, defendant further argues, plaintiff has presented no evidence that the arbitral process was undermined, because American did not breach any testing or collection procedures, Murphy's supervisors had reasonable suspicion of the use of intoxicants as defined under its policies, and the arbitrators' findings as to the chain of custody were rational and based on a full record.

1. *Virella's Pre–Arbitration Preparation, Communication with Murphy, and Conduct at the Hearing.*

■ Some of plaintiff's arguments can be dealt with summarily. First, the sheer number of telephone calls and pages placed by plaintiff, at defendant's estimate close to 200 in the period prior to the arbitration, suggests its own disposition. Virella explained in his deposition that while normally he gave his pager number to grievants only a month prior to the arbitration hearing, due to their friend-

ship, the plaintiff had access to his pager for the entire time. Virella also explained that he told Murphy that he would only return his telephone calls when he had new information to convey. By plaintiff's own calculations, Virella returned one out of every four calls placed to him, *see* Pl. Mem. in Opp. at 22, and given the frequency and number of plaintiff's calls, this number does not seem so egregious or arbitrary that an inference in favor of the plaintiff could be reasonably drawn. While plaintiff contends that it establishes "a disturbing pattern of relegating the plaintiff to a position of least priority with respect to [Virella's] other union business," the evidence suggests at the most, negligence, if not a reasoned approach to an over-demanding grievant. *See Coleman v. City of New York*, 1999 WL 1215570 (E.D.N.Y.) (holding at motion to dismiss stage that failure to return phone calls does not amount to breach of duty of fair representation on part of the union).

■ Similarly, plaintiff's claim that Virella told him that he was taking plaintiff's case to arbitration because of their friendship, not because he was obligated to do so, does not support an inference that Virella's conduct was arbitrary or somehow in bad faith. Even assuming that Virella made this statement to Murphy, Virella's statement may well have been accurate: that he was pursuing the grievance to arbitration because of his personal relationship to Mr. Murphy, and would not have otherwise done so. An individual employee does not have an absolute right to have his or her grievance taken to arbitration, regardless of the union's assessment of its merits or the terms of the collective bargaining agreement. *See Vaca*, 386 U.S. at 189, 87 S.Ct. 903.

■ Finally, Virella's consumption of a double vodka and tonic before the closing argument does not have legally fatal proportions plaintiff assigns it. Plaintiff argues that his evidence of Virella's arbitrary conduct "begins and ends" with the

pre-closing drink, because the incident was symptomatic of Virella's lack of concern and solicitude for plaintiff's case. Even if one were to agree that such inferences could be drawn from this isolated incident, plaintiff's evidence fails to demonstrate how the arbitral process was thereby seriously undermined. To the extent one can judge from the transcript, Virella's closing argument was comprehensible and articulate, although elements such as demeanor and bearing of course cannot be thus measured. He focuses on the chain of custody issue, and responds to the theme of trust laid out in the employer's opening statement. Ex. 5 at D00414. He summarized the testimony favorable to Mr. Murphy, and made an appeal based on his character. Plaintiff appears to ask the Court to find that having a drink during an arbitration hearing constitutes a per se breach of the duty, even without evidence that the arbitration result might somehow have been different had Virella not so indulged. While the irony of such unprofessional conduct in light of the claims in this case is not lost on the Court, it is insufficient to prove a breach of the duty of fair representation, absent some evidence that the alcohol consumption undermined the arbitral process.

### 2. Virella's Strategic Choices at the Arbitration

Plaintiff's arguments regarding Virella's strategic choices during the course of the hearing present more difficult issues. To support his argument against summary judgment, plaintiff relies primarily on two cases, *Peters v. Burlington Northern Railroad Co.*, 931 F.2d 534 (9th Cir.1990), and *Holodnak v. Avco Corp.*, 381 F.Supp. 191 (D.Conn.1974), *aff'd* on other grounds, 514 F.2d 285 (2d Cir.1975).

In *Peters*, the plaintiff was denied certain benefits at an arbitration hearing. In his subsequent federal lawsuit, he identified two reasons why he was entitled to those benefits, based on an interpretation of provisions of the collective bargaining agreement which arguably supported his position, but claimed that the union had ignored those arguments and failed to reference those provisions in processing his grievance. The union did not provide any justification or rationale for its decision to do so, and the court held that "when a union inexplicably ignores a strong substantive argument that must be advanced in order for the employee to prevail on the merits of his grievance, the egregious nature of its failure transcends mere negligence." *Id.* at 539. Similarly, in *Holodnak*, the court found that the union acted in bad faith, in violation of its duty of fair representation, when the union representative failed to challenge the operative rule on First Amendment grounds, which in the court's view was easily subject to overbreadth and vagueness challenges. *Id.*

▮ Most of the tactical decisions challenged by plaintiff, however, do not rise to the level of those found arbitrary in *Peters* and *Holodnak*. Plaintiff first argues that Virella's failure to pursue a line of questioning concerning the possibility that a hypodermic needle could have been inserted into the urine specimen bottle was arbitrary and substantially undermined the arbitral process, given that the neutral arbitrator specifically found that the integrity of the specimen had not been breached. While Virella did withdraw this particular question, one which appears to the Court from the record would have elicited a speculative answer, he did cross-examine Hardge on the integrity of the specimen. *See* Ex. 5 at D00264, D00267. Further, no evidence has been presented that would even allow an inference that if Virella had asked the withdrawn question, the responsive answer might have caused the neutral arbitrator to reach a different conclusion regarding specimen integrity. Absent any evidence that Hardge's answer would have revealed something beneficial to plaintiff's case, at the most Virella's decision was a tactical one that, in hindsight, can be proved to have been unwise. Thus the withdrawal of this

question does not fall into the category of omissions "so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *See Barr*, 868 F.2d at 43.

■ Plaintiff next contends that Virella failed to argue that American Airlines lacked reasonable suspicion to test Plaintiff for drug use. It is not disputed that Plaintiff was seen by his two supervisors sitting at a booth in a bar, with a half empty, open beer bottle on the table in front of him. Pursuant to American Airlines Regulation E 1, an employee is required to undergo drug and alcohol testing in any case in which the company has reasonable suspicion to believe that an employee is in violation of American Airlines Rules 25, 26, or 33. *See* Ex. L at 4. Rule 26, in turn, provides that ". . . drinking intoxicants in public while wearing a uniform with Company emblem or insignia is prohibited." Ex. N. Virella could have rationally concluded that, given circumstances which were hardly favorable to the Plaintiff, it did not make sense to argue the reasonable suspicion point.

While plaintiff argues that Virella should have pursued the reasonable suspicion argument because his denials of alcohol use operated to negate any suspicion, given the language of the above polices, the fact that plaintiff was found seated at a bar with a beer in front of him within an hour of the beginning of his shift, and the subsequent positive drug test, reasonable factfinders could only find that Virella's decision not to press this particular issue was a strategic choice, not arbitrary conduct. At Virella's deposition, he testified that in his experience, the definition of "reasonable suspicion" under the Company policy is so broad and ambiguous that "it pretty much gives them the right to just about test anyone," and he cited examples in support of this understanding. Ex. 7 at 179. He further testified that since Mr. Murphy had not been terminated for violating Rule 26, but instead for the positive drug test as

well as misrepresentations and leaving the work area, he did not see the reasonable suspicion issue as relevant, but was instead focused on the positive drug test. *Id.* at 212.

■ Plaintiff's final challenge to Virella's strategic decisions at the hearing warrants close examination. While Virella's primary focus in the hearing was the chain of custody problems with plaintiff's sample, he did not specifically argue that under DOT regulations, Stillwagon's retention of the sample for as much as six hours would have canceled the test. According to American's drug testing policy, the "Company will utilize the DOT collection, shipment and testing procedures for Company and DOT employee drug and alcohol tests." Ex. L at 6. The DOT regulations, in turn, lay out a number of procedures to ensure the integrity and identity of the urine specimen. *See* 49 C.F.R. § 40.25(f). These regulations, in relevant part, require the collection site person to ship the collected specimen to the testing laboratory, and ensure that the chain of custody documentation is enclosed in each container. *See* 49 C.F.R. § 40.25(h). Since express couriers and postal personnel do not have access to the sealed specimen, they need not be identified on the chain of custody documentation. The regulations continue as follows:

> This means that the chain of custody is not broken, and a test shall not be canceled, because couriers, express carriers, postal service personnel, *or similar persons involved solely with the transportation of a specimen to a laboratory,* have not documented their participation in the chain of custody documentation. . . .

*Id.* (emphasis added). The regulations further provide that "[u]nless it is impracticable for any other individual to perform this function, a direct supervisor of an employee shall not serve as the collection site person for a test of the employee." § 40.23(d)(3).

According to plaintiff, a negative inference can be drawn from this language that if persons not "involved solely with [ ] transportation" had custody of the specimen without documenting it on the chain of custody forms, as did Stillwagon in this case, there is a break in the chain of custody requiring that the test be canceled. The regulations further prohibit supervisors from having a significant role in the collection procedure, but Stillwagon nonetheless maintained custody of the specimen for six hours. According to plaintiff, these violations of the regulations would have rendered the results of the drug test invalid. As such, plaintiff argues, Virella's failure to highlight this potentially dispositive argument to the neutral arbitrator was arbitrary, and constituted a DFR breach.

The union appears to be arguing that the inference of cancellation for chain of custody breaks is not as clear as Murphy would have it. For instance, while the policy says that it incorporates the DOT regulations for collection procedures, the supervisor of the alcohol and drug testing program, Tammy Hardge, testified that "we require as Company policy that the supervisor is responsible for insuring the shipment of the kit by the courier." Ex. 5 at D00271. Further, Virella's deposition indicates that while he thought the DOT regulations were important, and saw the Company's violation of them as one of his primary defenses, Ex. 7 at 158, he had not focused on this particular aspect of the regulations. Rather, his theory was that all the chain of custody and administrative errors in this case sufficed to cancel the test. *Id.* at 168. The neutral arbitrator had access to the regulations, and Virella introduced another arbitration decision in which clerical errors in a drug test prompted the arbitrator to overturn a termination. Combined with the testimony of Virella's expert and his cross-examination of the Company's witnesses, he believed that he had presented sufficient evidence for the arbitrator to find that American

had violated the CFR collection procedures. *Id.* at 169.

While plaintiff's interpretation of the C.F.R. may be plausible, Virella's failure to articulate it does not amount to conduct by the union of "inexplicably ignoring a strong substantive argument." *Peters,* 931 F.2d at 534. He emphasized the chain of custody issue throughout the hearing, and in his closing statement he highlighted Stillwagon's retention of the specimen and how this contravened American's own written policy. Hearing Trans., Ex. 5 at D00416. In his deposition, he testified that while he did not consider himself "significantly versed" in the DOT drug testing regulations, Ex. 7, Virella Dep. at 128–29, in preparation for the hearing he read the regulations several times and highlighted provisions that seemed important. *Id.* at 172–73. He also introduced the relevant CFR regulations into evidence at the hearing. Requiring Virella to do more—such as combing through the regulations for every possible procedural argument—would be to hold him to the standard of an attorney, something courts have been loathe to do in the duty of fair representation setting. *See Baxter v. United Paperworkers Int'l Union, Local 7370,* 140 F.3d 745, 747 (8th Cir.1998); *Bruno v. United Steelworkers of America,* 983 F.2d 1065, 1993 WL 2300 (6th Cir.1993); *Valentin v. United States Postal Serv.,* 787 F.2d 748, 751 (1st Cir. 1986). While the Second Circuit has not explicitly addressed the issue, the district courts that have reached it are unanimous in their opinion. *See Lettis v. U.S. Postal Service,* 39 F.Supp.2d 181, 202 (E.D.N.Y. 1998) ("In the Court's opinion, union officials are not attorneys, and should not be held to a standard akin to legal malpractice.") (citing cases).

Plaintiff cites to *Walk v. P*I*E* Nationwide, Inc.,* 958 F.2d 1323, 1329 (6th Cir.1992), a case presenting the similar factual scenario of a duty of fair representation claim after an unsuccessful arbitration challenging a drug test-related termination. In that case, the magistrate judge

had found that the method of collecting and sealing the specimen "clearly violate[d] the procedures as outlined in the collective bargaining agreement," and the Sixth Circuit noted that a defect in the chain of custody may be grounds for setting aside a discharge for a drug test violation. *Id.* at 1329. The union, however, did not challenge the collection and sealing procedures in the initial stages of the grievance procedure, although it did attempt to introduce "new evidence" regarding these failures at a subsequent panel hearing. *Id.* at 1325. Despite the magistrate's finding that the procedures clearly violated the collective bargaining agreement, and the Court of Appeal's conclusion that defects in the chain of custody may have been sufficient to set aside the discharge, the Sixth Circuit nonetheless affirmed a grant of summary judgment for the union:

> Failure to challenge the procedure did not involve a mere tactical decision by [the union], and it did not involve a large expenditure of funds. It presents a very close question, but we are persuaded that this failure was more of an omission or oversight, a negligent error of judgment that was not directed against plaintiff capriciously or in bad faith. We accordingly conclude, despite some reservation, that this conduct was not outside the *O'Neill* standard under all the circumstances.

*Id.* at 1329, *citing Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) ("a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.")

In the Court's view, this case does not present as close question as in *Walk*, as Virella's failure to argue this particular interpretation of these CFR provisions was not arbitrary or wholly irrational conduct. First, Virella is not a lawyer interpreting the CFR, and should not be held

to the standard of one. In fact, some district courts have observed that federal law disfavors attorney involvement in grievance processing, as unions are to be the exclusive bargaining representative for workers in union facilities. *See Henry v. Community Resource Center*, No. 95 Civ. 5480, 1996 WL 251845, *8 (S.D.N.Y. May 13, 1996) (citing cases). Second, Murphy's argument based on the CFR is not as strong as the one "inexplicably ignored" by the union in *Peters*, which involved the application of a collective bargaining agreement provision that was directly on point, yet was not even cited by the union throughout the grievance procedure. 931 F.2d at 540. The CFR was not incorporated into the collective bargaining agreement here, so therefore any breaks in the chain of custody did not violate the collective bargaining agreement, as was the case in *Walk*. Rather, American's drug testing guidelines provide for the utilization of DOT procedures, but a company representative testified that it was "Company policy" to allow a supervisor to deliver the sample. Challenging this aspect of defendant's chain of custody procedures, then, would have required pursuing the difficult claim that American Airlines policy was improper because it violated the literal requirements of DOT regulations. Third, as compared to the union officials in *Walk* and *Peters*, Virella did make the requested argument here, in that one of his "primary defenses" was the chain of custody issue. While Virella's representation of Mr. Murphy might not have covered every conceivable permutation of that argument, or utilized every possible interpretation of every CFR provision, he introduced the CFR, he vigorously cross-examined all the Company's witnesses about their chain of custody procedures, and he introduced an expert witness of the plaintiff's choosing on the proper collection procedures. Finally, and crucially, plaintiff has not presented any evidence that this argument would have been persuasive to the neutral arbitrator, such as evidence of other discharges overturned or indications in the record that the

arbitrator was undecided on the chain of custody issue.

Even considering the alleged failings on the part of Virella in the aggregate, as plaintiff urges, plaintiff's evidence is insufficient to allow a factfinder to conclude that the union's representation of him was somehow arbitrary or irrational, or done in bad faith. Virella adequately prepared for the hearing, he objected to the admission of certain evidence and subjected the Company's witnesses to cross-examination, he called as an expert witness an individual of plaintiff's choosing, and he reviewed and submitted the relevant sections of the federal regulations. While in hindsight, an attorney may be able to find flaws with his interpretation of the CFR, this failing constitutes negligence at the most, and cannot suffice to demonstrate a breach of the duty of fair representation, given the important federal policies that are protected by the high standard applied to such a claim.

## V. CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment [doc. # 61] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.